ORIGINAL

1  E. Thomas Barham, Jr., State Bar #105381
   Shirley A. Ostrow, State Bar #109788
2  LAW OFFICES OF BARHAM AND OSTROW
   3349 Cerritos Avenue
3  Los Alamitos, California 90720
   (562) 598-2456    Fax No: (562) 598-7572
4

5  Attorneys for Plaintiff

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

D-SEND

FILED
CLERK, U.S. DISTRICT COURT

MAY - 9 2007

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

LODGED
CLERK, U.S. DISTRICT COURT
MAY 1 4 2007
DISTRICT OF CALIFORNIA
BY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| JOSEPH DENSMORE, JR., | CASE NO: CV 06-3535 SJO (RZx) |
| Plaintiff, | FIRST AMENDED COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF 42 U.S.C. §1983 |
| vs. | |
| CITY OF MAYWOOD, BRUCE LEFLAR, ANGEL VILLEGAS, SEAN RICHARDSON, JERRY SALGADO, ROBERT LEACH, DARIN MOELLER, PAUL PINE AND FLORENCIO MESA, | DEMAND FOR JURY TRIAL |
| Defendants. | |

## JURISDICTION AND PARTIES

1.   This is an action for money damages and equitable relief brought by Plaintiff Joseph
     Densmore, Jr. (Densmore) pursuant to 42 U.S.C. §1983 and §1988, and the First
     and Fourteenth Amendments to the United States Constitution.

2.   Densmore seeks recovery of damages from the City of Maywood (Maywood),
     Maywood Police Chief Bruce Leflar (Leflar), Sergeant Sean Richardson
     (Richardson), Sergeant Jerry Salgado (Salgado), Officer Angel Villegas (Villegas)

DOCKETED ON CM

MAY 10 2007

BY _____ 053

First Amended Complaint                    - 1 -

1    Sergeant Robert Leach (Leach), Sergeant Darin Moeller (Moeller)[1], Lieutenant

2    Paul Pine (Pine) and Officer Florencio Mesa (Mesa), police officers of the City of

3    Maywood, in their individual capacities and Leflar in both his individual and official

4    capacities.

5   3.    Jurisdiction is based upon 28 U.S.C. §1331 and §1343.

6   4.    Densmore is an individual over the age of 18 and at all times herein mentioned was

7    a resident in Orange County, California.

8                     **FACTS RELEVANT TO ALL CLAIMS**

9   5.    Densmore was hired as a Police Officer by Defendant City of Maywood on April

10    1, 2004 along with Cesar Vizcarra and Margarito Guerro.  Densmore was

11    terminated from employment by Leflar on or about June 16, 2004.

12  6.    Densmore was required to serve as a probationary employee for 18 months.  During

13    that probationary period, the City was at liberty to dismiss Densmore from

14    employment at any time with or without cause.  However, Densmore could not be

15    dismissed for an impermissible reason.  Retaliation for reporting misconduct by

16    other police personnel was not a permissible reason for dismissing Densmore from

17    employment as a probationary police officer.

18  7.    Densmore is informed and believes and therefore alleges that the Maywood Police

19    Department hired 32 probationary officers between January 1, 2000 and March 5,

20    2005. Maywood Police Department was comprised of approximately 45 total

21    employees of which 35 were full time peace officers and 10 civilian employees.

22  8.    The Maywood Police Department's field training program for newly hired police

23    officers generally lasted 14 weeks.

24  9.    Densmore is informed and believes and therefore alleges that he was the only

25    probationary police officer dismissed from employment by the Maywood Police

26

27         [1]Moeller is presently a Police Sergeant.  Moeller was a Police Captain at all

28  times relevant to this lawsuit.

First Amended Complaint                      - 2 -

Department for a non-disciplinary reason from January 1, 2000 to the present time.

10. During that time, newly hired officers worked under the supervision of experienced field training officers (FTOs).

11. The rules and regulations of the California Commission on Peace Officers Standards and Training were applicable to the Maywood Police Department pursuant to Penal Code Sections 13500 et seq.

12. Title 11, Division 2 of the California Code of Regulations §1004(d) provides as follows:

> (1) Every newly appointed FTO shall:
>
> > (A) successfully complete a POST-certified Field Training Officer Course (as set forth in PAM, section D-13) prior to training new officers. . . .

13. Prior to Densmore's hire by the City of Maywood he had undergone a complete background check, which included a criminal history, prior employment record, psychological evaluation, and education and law enforcement training.

14. The Rio Hondo Police Academy was and is accredited by the California Commission on Peace Officers Standards and Training to certify its graduates pursuant to the provisions of California Penal Code §832.

15. Densmore was graduated from the Rio Hondo Police Academy on April 7, 2003. Densmore was graduated 15th out of 95 class members. His aggregate score on all tests was 95%.

16. Densmore is informed and believes and therefore alleges that he and Sergeant Scott Anderson were the only officers in the Maywood Police Department to have graduated from a four year college.

17. Densmore was not fired because of any deficiency in his performance as a police officer but as reprisal for reporting misconduct by a fellow officer. The identity of that officer is subject to a protective order in the matter of *Flores v. City of Maywood, et.al.*, United States District Court, Case Number CV 04-7565 GPS

1    (Ex)[Docket #27].  Therefore the name of that officer is set forth herein as Officer

2    X.

3  18.    Densmore was first assigned to work with FTO Raul Mayorga (Mayorga).

4        Mayorga completed written performance appraisals on Densmore for the month of

5        April, 2004.  Mayorga and Densmore were assigned to work Tuesday through

6        Sunday, 1600 until 0600 hours.  Those days of the week and hours provided

7        Densmore with exposure to the greatest amount and diversity of police activity of

8        any shift and hours.

9  19.    FTO Moyora's written appraisals of Densmore's performance did not reflect

10        problems with Officer Safety during the thirteen (13) ten-hour shifts they worked

11        together in April 2004.   The two worked a busy *crime car* on the 2000 to 0600

12        shift, Sundays through Wednesdays.

13  20.    The Maywood Police Department Field Training Program required that trainees

14        sign each Daily Observation Report (DOR) after his FTO reviewed daily ratings

15        with his trainee.

16  21.    Densmore's signature does not appear on a single DOR prepared by Moyorga.

17  22.    Densmore was next assigned to work with FTO Officer X. Their shift and hours

18        were Tuesday through Sunday, 1600 until 0600 hours.

19  23.    Officer X was Densmore's second FTO. They worked ten (10) ten-hour shifts

20        together.

21  24.    Despite a Request for Production, Defendants have not produced a single DOR

22        prepared by Officer X for Densmore; instead, Defendants provided a single sheet

23        of paper with handwritten entries for April 29 and 30.  That document is not signed

24        by either Officer X or by Densmore.  The notes are not on a DOR form.

25  25.    On May 13, 2004, Officer X  and Densmore took custody of Jose Bernal (Bernal)

26        after he was arrested by Jose Uribe (Uribe), a private person, pursuant to California

27        Penal Code §837, for misdemeanor battery, proscribed by  Penal Code §242.

28  26.    Uribe sought police help after he was physically attacked by Bernal.  Officer X and

First Amended Complaint                           - 4 -

1    Densmore were assigned to handle the *fight call* dispatched as a result of Uribe's

2    telephone call to the Police. Maywood Police Officer Frank Menchaca (Menchaca)

3    was the first officer to arrive at the scene.

4    27.    Bernal had been drinking and appeared to be mentally unstable. Menchaca verbally

5    provoked Bernal by referring to him as "dip shit."

6    28.    Bernal, who had been cooperative with officers prior to Menchaca's insult,

7    responded with verbal abuse directed at Menchaca, Officer X and Densmore.

8    29.    Officer X, who was driving the police car which transported Bernal to the

9    Maywood Police Station, retaliated against Bernal by repeatedly and abruptly

10    applying, then releasing the brakes of the police car. Densmore was in the right

11    front seat of the police car.

12    30.    The sudden changes of speed caused by the repeated braking and accelerating

13    caused Bernal's body to ricochet back and forth. Bernal's body struck the barrier

14    separating the front seat from the rear passenger/prisoner area of the patrol car, a

15    hard rubberized material installed in place of factory installed cushioned seats.

16    31.    After Officer X, Densmore and their prisoner arrived at the Maywood Police

17    Station, Officer X instructed Densmore to position himself on Bernal's right side.

18    Officer X grabbed hold of Bernal's left arm and pulled him out of the patrol car.

19    Bernal was handcuffed with his hands behind his back.

20    32.    A police department video tape monitor captured the scene as Officer X jerked

21    Bernal out of the patrol car, bent him forward and rammed Bernal's head into a

22    wall. Officer X then jerked Bernal backwards and rapidly walked him towards the

23    door leading to the interior of the Station – not into the booking area.

24    33.    Officer X rammed Bernal's head into another wall then choked him into

25    unconsciousness. Densmore observed Officer X's actions.

26    34.    Bernal was rendered unconscious by the beating and choking. He was bleeding

27    from wounds to his face and slumped to the ground.

28    35.    Los Angeles County Fire Paramedics and an ambulance were summoned to the

Maywood Police Department.  Paramedics examined Bernal and determined that he required emergency medical care. Bernal was transported to St. Francis Hospital for care and treatment.

36.   Richardson was the Watch Commander on May 13, 2004.  In that capacity, Richardson was the senior officer on duty at the time of the incident.

37.   Officer X  briefed Richardson regarding his use force against Bernal. Richardson wrote a Use of Force memorandum.  Richardson failed to question Densmore, choosing to listen only to Officer X's version of the incident.

38.   Richardson telephoned Moeller to brief him. Moeller was then a police captain, the second highest ranking officer in the Maywood Police Department. On October 1, 2004, Moeller voluntarily took a demotion to Sergeant.

39.   Officer X directed Densmore to prepare an arrest report falsely asserting that Bernal committed a felony assault with force likely to result in great bodily injury in violation of §245 of the California Penal Code by (i) head butting Officer X, (ii) kicking Officer X, and (iii) attempting to bite him.  Officer X also falsely claimed that Bernal attempted to escape.

40.   Officer X chastised Densmore for not *jumping in* and *getting his hands dirty* when Officer X was physically abusing Bernal.

41.   Densmore was reluctant to report Officer X's beating of Bernal to Richardson because he felt it would fall on deaf ears.  Richardson had set the tone of his leadership style at the first shift briefing Densmore attended on April 1, 2004.  At that time Richardson  exclaimed: "This is not Orange County or Arcadia.  We do things differently here."

42.   Officer X ultimately completed the false police report on the Bernal incident after becoming exasperated with Densmore's report.  Although the report indicated that it was written by Densmore, Officer X actually authored the vast majority of the report, including all of the false assertions.

43.   On May 14, 2004, Densmore sent an e-mail to Leach alerting him to problems with

1  the Bernal arrest report.  Specifically, Densmore wrote that Officer X was upset

2  with him for not getting his hands dirty, that he felt that the force used by Officer

3  X was excessive and that Officer X  instructed him to leave things out of the report

4  which should have been included. Densmore concluded by writing: "I do not know

5  what I should do about the situation, and feel that you are the right person to speak

6  with regarding the incident.  Please advise."

7  44.  Leach was the administrative assistant to Chief Leflar at the time of the Bernal

8       incident.

9  45.  Leach did not document Densmore's concerns or otherwise generate any sort of

10      correspondence in response to Densmore's communication.

11  46.  Leach never met with Densmore about his correspondence.

12  47.  However, Leach immediately met with Officer X and showed him the e-mail that

13      Densmore had sent to him about the Bernal incident.

14  48.  Leach knew that Densmore was scheduled to work with Officer X on a ten hour

15      shift commencing within minutes after he showed Officer X the e-mail Densmore

16      wrote.

17  49.  Moeller, the second in command at the Maywood Police Department, was

18      responsible for reviewing the videotape of the Bernal incident.  In fact, during their

19      telephone conversation on May 13, 2004, Moeller told Richardson that he would

20      review the sally port videotape on Friday, May 14, 2004, when he came to work.

21  50.  Moeller did not generate any sort of correspondence between May 13, 2004 and

22      May 20, 2004, documenting the unnecessary/unlawful use of force by Officer X

23      against Bernal.

24  51.  Likewise, Moeller did not prepare or cause to be prepared any sort of writing

25      between May 13,  2004 and May 20, 2004, documenting the fact that the arrest

26      report contained knowingly false statements, despite the fact that a review of the

27      video tape clearly and directly refuted Officer X's claims that Bernal attempted to

28      escape and/or attempted to head butt Officer X.

First Amended Complaint                              - 7 -

52. Leflar and Moeller met with Densmore on or about Thursday, May 20, 2004, at Leflar's direction in his office at the Police Station.

53. The meeting between Densmore, Leflar and Moeller was not part of Densmore's normal job responsibilities.

54. Densmore truthfully answered all questions posed to him by Chief Leflar and Captain Moeller.

55. Among the statements Densmore made during that meeting were the following:
   - Densmore reported that Bernal did not attempt to escape.
   - Densmore reported that it was Officer X who initiated violence against Bernal and that Bernal did not attempt to hit or bite Officer X.
   - Densmore reported that he saw Officer X slam Bernal's head into the wall adjacent the police car.
   - Densmore reported that Officer X falsified official reports to justify the injuries Officer X inflicted on Bernal.

56. Densmore did not know that there was a videotape of the incident when he described the events to Chief Leflar and Captain Moeller. The two senior officers played the video tape of the May 13, 2004, incident for Densmore after Densmore answered Leflar's and Moeller's questions.

57. Densmore's version of the events corresponded precisely with the events captured by the video camera. This fact was cited by Leflar in his letter addressed to Officer X notifying him of Leflar's intent to terminate Officer X from the Maywood Police Department.

58. Leflar ordered an internal affairs investigation after he and Moeller met with Densmore on May 20, 2004.

59. On May 20, 2004, Leflar notified Officer X, in writing, that he was the subject of an internal investigation.

60. Salgado began a retaliation campaign against Densmore on May 16, 2004, the last day Densmore worked with Officer X and two days after Densmore reported

Officer X for misconduct. Salgado remonstrated with Densmore about controlling witnesses at the scene of a murder investigation at the King Taco Restaurant. Officer X was responsible for evaluating Densmore's field performance at the King Taco Restaurant on the departmentally approved DOR and did so. However, Officer X's ratings and comments on the May 16, 2004 DOR differed substantially from Salgado's report of alleged incompetence and insubordination.

61. Salgado confronted Densmore with a written reprimand on May 24, 2004, eight days after the King Taco incident. Salgado demanded that Densmore sign an acknowledgment of the reprimand in Villegas' presence, despite the fact that Officer X was Densmore's FTO at the time of Densmore's allegedly deficient performance.

62. Moeller's signature appears on the reprimand as if he witnessed it being signed; however, Moeller was not present when the reprimand was presented to Densmore.

63. Salgado ordered Densmore to sign the reprimand despite his knowledge that the allegations in the document were twisted in order to give the impression that Densmore failed to follow orders and/or that he was incompetent. The May 16, 2004 DOR written by Officer X and signed by Densmore has been withheld in discovery.

64. The Salgado reprimand was presented to Densmore four days after Densmore met with Moeller and Chief Leflar to describe Officer X's misconduct.

65. After Densmore reported Officer X for misconduct, Leflar reassigned Densmore to work with Villegas. Villegas was Densmore's third FTO.

66. Densmore was assigned to work with Villegas at the end of his seventh week of training.

67. Villegas had never attended or graduated from a P.O.S.T. certified FTO program, hence he was ineligible to perform FTO duties (see paragraphs 11 and 12, above).

68. Plaintiff is informed and believes and therefore alleges that Villegas was deeply in debt and had health problems which prompted requests for him to take a disability

1     retirement.

2  69.  Villegas was arrested for felony spousal violence by the Brea Police Department

3     on November 3, 2002.

4  70.  Because of Villegas' health and personal financial problems, he was an ideal

5     candidate to carry out the conspiracy to get rid of Densmore.

6  71.  Villegas worked with Densmore 10½ days, assigned to a traffic enforcement unit

7     on day shift (0600-1600 hours). Every DOR submitted by Villegas criticized

8     Densmore for Officer Safety discrepancies.

9  72.  Villegas proceeded to nit-pick Densmore's field work.  Although Densmore's

10    training records prior to reporting Officer X's criminal conduct were essentially

11    unblemished, Villegas began recording and compiling a book on Densmore to give

12    the appearance that he failed to follow established patrol protocols. On the first day

13    Villegas and Densmore rode together, Villegas told Densmore that he was not

14    going to make it.

15  73.  Villegas and Leach collaborated on a seven page Monthly Evaluation

16    recommending Densmore's termination.

17  74.  Densmore allegedly signed the document on June 14, 2004, which was allegedly

18    witnessed by Defendants Moeller, Villegas and Pine.

19  75.  However, Densmore's last day at work was June 13, 2004. Densmore's signature

20    is a forgery.

21  76.  Government Code 3305, provides a peace officer with the opportunity to rebut any

22    adverse entry placed in the officer's personnel file. Densmore was denied that right

23    when his signature was forged on the final evaluation. That evaluation has

24    subsequently been provided to prospective law enforcement employers including

25    the Fountain Valley Police Department, which rejected Densmore for employment.

26  77.  After Densmore met with Chief Leflar and Captain Moeller, he noticed a marked

27    change in the demeanor of other officers.  When he entered the Station, Densmore

28    was   subjected to the cold shoulder by other officers.  Officer Joe Hardin

1   exemplified the attitude of other officers when he said: *I smell cheese – I guess*

2   *there must be a rat in the area.* That statement was made by Hardin in the presence

3   of Villegas, who was then Densmore's FTO.

4   78.   After the Bernal incident, Leach made the statement: "We should have left him in

5   Orange County."  That statement was made about Densmore in his presence and

6   the presence of other officers.

7   79.   Richardson was the Department Field Training Sergeant.  It was his responsibility

8   to monitor and counsel with officer trainees.  Richardson never met with Densmore

9   regarding his progress in training or his lack of progress.

10   80.   During Densmore's 11½ weeks of field training, not a single supervisor other than

11   Salgado, told Densmore that he was not progressing satisfactorily.

12   81.   When Densmore met with Leflar on June 16, 2004, Leflar told Densmore that he

13   was terminating him from service with the City because he had not satisfactorily

14   progressed in the training program.  When he fired Densmore, Leflar said: "You

15   just do not get it."

16   82.   Densmore reported Officer X's misconduct just as any responsible citizen would

17   have done, but also because the Maywood Police Department had adopted a

18   General Order applicable to all police personnel directing officers to report

19   misconduct by fellow officers and guaranteeing them immunity from retaliation.

20   83.   Densmore's speech was protected because he obeyed his employer's mandate to

21   report misconduct on an issue of public importance and truthfully answered all

22   questions Leflar and Moeller asked at a meeting they convened and which

23   Densmore was compelled to attend.

24   84.   On June 17, 2004, Leflar finally notified Officer X, in writing, that he was on

25   administrative leave as a result of the administrative investigation into his use of

26   force against Bernal and the reports he prepared.

27   85.   On September 28, 2004, Leflar notified Officer X, in writing, that he was being

28   fired based on his actions in connection with the Bernal incident.

First Amended Complaint                                    - 11 -

86.  A **code of silence** exists within the Maywood Police Department which served to insulate officers from accountability for misconduct.

87.  Prior to the May 13, 2004 incident, Densmore, Officer X, Mayorga and Margarito Guerrero, all on-duty officers, were eating at a Denny's restaurant when they were joined by Menchaca, who was off duty and intoxicated. Menchaca launched into a diatribe about Maywood cops needing to stick together. Menchaca then said that he wanted to kill someone while working as a police officer. Shortly after 2:00 a.m. on July 25, 2004, Michael Dale Anderson, Jr. (Anderson) was shot dead by Menchaca of the Maywood Police Department at his residence, located at 4448 Clara Street, in the City of Cudahy. Menchaca and the City of Maywood was sued for violating Anderson's constitutional rights. That case settled for $2,300,000.

88.  Densmore's report regarding Officer X's misconduct had put the Defendants on notice that he would not tolerate police misconduct and would not observe the code of silence.  Densmore's continued employment with the Maywood Police Department was therefore likely to jeopardize a scheme of kickbacks from the operators of Maywood Club Tow, aka TK and EF Partnership.

89.  Plaintiff is informed and believes and therefore alleges that Tooradj Khosroadbadi (Khosroadbadi) and Elvia Franco (Franco) are the individual partners comprising TK and EF Partnership.

90.  Pine was a sergeant at all times relevant to this action. Pine is now a lieutenant.

91.  Plaintiff is informed and believes and therefore alleges that Pine was deeply involved with Khosroadbadi and Franco in the kickback scheme.

92.  Plaintiff is informed and believes and therefore alleges that Khosroadbadi gave large sums of cash to Leflar, to various Maywood Police officers who were productive in impounding cars and to members of the Maywood City Council.

93.  Plaintiff is informed and believes and therefore alleges that certain Maywood elected officials, police officers and Chief Leflar were transported to Las Vegas, were provided with free accommodations, were given substantial sums of cash and

1  were furnished with prostitutes by Khosroadbadi in return for acting as his official

2  bounty hunters.  Car impounds were the bounty these corrupt officials and officers

3  delivered.

4  94.  Mesa was assigned to work traffic enforcement during all times relevant to this

5  action.  On June 6, 2004, Mesa contributed information for a DOR on Densmore

6  criticizing him for field performance.

7  95.  The Maywood Police Department Field Training Protocol provided that no DOR

8  will be prepared when a trainee rides with a non-FTO; therefore, Mesa's DOR

9  criticisms of Densmore were contrary to the official policies of the Maywood Police

10  Department and constitutes further evidence of a conspiracy to violate Densmore's

11  constitutional rights.

12  96.  Plaintiff is informed and believes and therefore alleges that Mesa was motivated to

13  join the conspiracy to violate Densmore's constitutional rights because Mesa had

14  been engaging in illegal sex acts with a female minor who, at one time, worked at

15  the Maywood Police Department as an Explorer Scout.

16  97.  Plaintiff is informed and believes and therefore alleges that Mesa was shielded by

17  Leflar, Leach, Pine, Salgado and Moeller from a criminal investigation into

18  unlawful sex acts with a minor because he impounded an average of 100 cars per

19  month.

20  98.  Plaintiff is informed and believes and therefore alleges that the teenager had two

21  abortions, one in Honduras, before delivering a child on her third pregnancy by

22  Mesa.

**FIRST CLAIM FOR RELIEF**

**42 U.S.C. SECTION 1983**

**[Plaintiff Densmore Against All Defendants Except the City]**

**FIRST AMENDMENT – RETALIATION AND CONSPIRACY**

27  99.  Plaintiff realleges and incorporates by reference herein paragraphs 1-98 of this First

28  Amended Complaint.

First Amended Complaint                  - 13 -

100. Defendants retaliated against Densmore for reporting Officer X's criminal behavior.

101. The retaliation took the form of creating a hostile environment within the police Department in an effort to force Densmore to resign.

102. When the effort to force Densmore to resign did not meet with success, the Defendants conspired with one another to fabricate and/or embellish official records regarding Densmore's actions and/or alleged inactions as a police officer.

103. Densmore alleges, on information and belief, that Villegas was assigned by Leflar, Richardson, Leach, Pine, Moeller and Salgado to falsify Densmore's training records. Villegas did as he was told.

104. Densmore alleges, on information and belief, that Mesa was assigned by Leflar, Richardson, Leach, Pine, Moeller and Salgado to falsify Densmore's training records. Mesa did as he was told.

105. Salgado's, Mesa's and Villegas' documentation was then seized upon by Leflar to falsely justify firing Densmore from his job as a police officer.

106. The above named Defendants conspired with one another to do the above listed acts knowing that Densmore, as any citizen, had the clearly established right under the First Amendment of the United States Constitution to report Officer X's criminal behavior.

107. Defendants' actions violated Densmore's First Amendment right to freedom of speech regarding matters of public concern. Densmore would not have been subjected to adverse employment actions but for his report about the use of unnecessary and unlawful force by Officer X against Bernal and Officer X's falsification of official reports concerning the force he used against Bernal and the reasons for that force.

108. As a proximate result of Defendants' actions, Densmore suffered special damages in the form of lost income, loss of employee benefits, including a paid medical plan in an amount to be proven at trial. Densmore seeks reinstatement to his previous position, back pay and allowances and restoration of all seniority as though he had

1    been continuously employed.

2  109.  As a proximate result of Defendants' actions, Densmore suffered general damages

3    including loss of reputation and emotional distress, the value of which will be

4    proven at trial.

5  110.  The acts and omissions of each Defendant set forth in this complaint (except

6    Defendant Maywood) were done by each Defendant knowingly, intentionally and

7    maliciously and for the purpose of harassment, oppression and infliction of injury

8    upon Plaintiff, and in reckless, wanton and callous disregard of Plaintiff's safety,

9    security and civil rights; and by reason thereof, Plaintiff claims exemplary and

10    punitive damages from each Defendant (except Maywood) in a sum to be

11    determined at the time of trial.

12  **SECOND CLAIM FOR RELIEF**

13  **42 U.S.C. SECTION 1983**

14  **[Plaintiff Densmore Against Defendants LeFlar and City of Maywood]**

15  **FOURTEENTH   AMENDMENT  –  VIOLATION   OF   EQUAL**

16  **PROTECTION OF LAW – CLASS OF ONE**

17  111.  Plaintiff realleges and incorporates by reference herein paragraphs 1-110 of this

18    First Amended Complaint.

19  112.  It is against public policy for a governmental agency to engage in reprisal in the

20    form of loss of employment for reporting serious misconduct by a police officer.

21  113.  Densmore was a *class of one* because he was the only probationary employee of

22    the Maywood Police Department fired for reasons other than disciplinary problems.

23  114.  *Class of one* is a term explained by the Court in <u>Village of Willowbrook v. Olech</u>,

24    528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000)(holding that a "class

25    of one" may assert an equal protection claim).

26  115.  Densmore was a *class of one* because he was the only Maywood Police

27    Department employee to have reported another police officer for use of improper

28    force.

First Amended Complaint                           - 15 -

116. Densmore was a *class of one* because he was the only Maywood Police Department employee to report another officer for making a false police report.

117. As a probationary police officer, Densmore had a recognized property right to continued employment if dismissal from employment was motivated by the desire to punish speech on an issue of public importance.

118. The Defendants did not have a rational basis for terminating Densmore's employment.

119. The reasons given for terminating Densmore's employment were a pretext for the true reasons and were objectively false.

120. In terminating Densmore's employment, Defendant Leflar actually acted based on an improper motive, namely to maintain the code of silence within the Maywood Police Department.

121. The decision to terminate Densmore's employment as a Maywood Police Officer violated his Fourteenth Amendment right to equal protection of the law.

122. Densmore seeks reinstatement to his previous position, back pay and allowances and restoration of all seniority, as though he had been continuously employed.

### THIRD CLAIM FOR RELIEF
### 42 U.S.C. SECTION 1983
### [Plaintiff Densmore Against Defendant City of Maywood]
### MUNICIPAL LIABILITY – MONELL

123. Plaintiff realleges and incorporates by reference herein paragraphs 1-109 and 112-122 of this First Amended Complaint.

124. At all times relevant to this lawsuit, Leflar was the *policymaking official* of the City of Maywood Police Department, as that term applies to municipal liability under 42 U.S.C. §1983.

125. Prior to June 16, 2004, Maywood developed and maintained policies or customs exhibiting deliberate indifference to the constitutional rights of persons in Maywood which caused the violation of Plaintiff's rights.

First Amended Complaint                                    - 16 -

126.  It was the policy and/or custom of Maywood Police Department to inadequately and improperly screen potential employees, to promote employees who had demonstrated disregard for the rights of those policed by the Maywood Police Department and who were disinclined to properly and thoroughly investigate internally generated as well as externally initiated complaints of police misconduct. As a result, acts of misconduct by Maywood Police Department personnel were tolerated by Maywood police officials.

127.  It was the policy and/or custom of Maywood to inadequately supervise and train its police officers, including the Defendant officers, thereby failing to adequately discourage further constitutional violations on the part of its police officers.

128.  As a result of the above described policies and customs, Maywood police officers, including the Defendant officers, believed that their actions would not be properly monitored by those senior to them and that misconduct would not be properly investigated or sanctioned, but would be tolerated.

129.  A code of silence was fostered and encouraged to exist within the Maywood Police Department which served to insulate officers from accountability for their actions.

///
///
///
///
///
///
///
///
///
///
///
///

First Amended Complaint                    - 17 -

130.    The above described policies and customs demonstrated a deliberate indifference on the part of policymakers of the City of Maywood to the constitutional rights of persons within Maywood, and was the cause of the violations of Plaintiff's rights alleged herein.

LAW OFFICES OF BARHAM AND OSTROW

DATED: March 12, 2007          By:    _E. Thomas Barham_
                                      E. Thomas Barham, Jr.
                                      Attorneys for Plaintiff Joseph Densmore, Jr.

DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury.

LAW OFFICES OF BARHAM AND OSTROW

DATED: March 12, 2007          By:    _E. Thomas Barham_
                                      E. Thomas Barham, Jr.
                                      Attorneys for Plaintiff Joseph Densmore, Jr.

# PROOF OF SERVICE

**STATE OF CALIFORNIA, COUNTY OF ORANGE**

I am employed in the County of Orange, State of California. I am over the age of 18 and not a party to the within action. My business address is 3349 Cerritos Avenue, Los Alamitos, California 90720.

On March 13, 2007, I served the foregoing document described as FIRST AMENDED COMPLAINT FOR DAMAGES on interested parties in this action by placing the original or a true copy thereof enclosed in sealed envelope addressed as follows:

Lee A. Wood and Associates, P.C.
Mr. Raymond E. Brown
5 Hutton Center Drive, 12th Floor
Santa Ana, California 92707
FAX NO: 714 210-7515

✓   **(By Mail)** I deposited such envelope in the mail at Los Alamitos, California. The envelope was mailed with postage thereon fully prepaid.

___   **(By Personal Service)** I delivered such envelope by hand to the offices of the addressee.

___   **(By Electronic Transfer)** I caused all of the pages of the above entitled document to be sent to counsel via electronic transfer (facsimile) at the telephone numbers indicated above.

✓   **(Federal)** I declare under penalty of perjury that the foregoing is true and correct and that I am employed in the office of a member of the Bar of this Court at whose direction the service was made.

Executed this 13th day of March, 2007, at Los Alamitos, California.



Sue Barham